**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

LINDENWOOD FEMALE COLLEGE
d/b/a LINDENWOOD UNIVERSITY,
individually and on behalf of all
others similarly situated,

                    Plaintiff,

v.

ZURICH AMERICAN INSURANCE
COMPANY,

                    Defendant.

Case No. 20-cv-1503

COMPLAINT

Class Action

DEMAND FOR JURY TRIAL

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lindenwood Female College d/b/a Lindenwood University ("Plaintiff"), individually and on behalf of all other similarly situated institutions of higher education, for its Class Action Complaint against Defendant Zurich American Insurance Company ("Defendant"), states and alleges as follows:

## NATURE OF ACTION

1.    Institutions of higher education have been hit particularly hard by the ongoing COVID-19 pandemic. Since the disease began to spread rapidly across the country in late February and early March 2020, almost every college and university has taken drastic and unprecedented action to protect their students, faculty, staff, and the general public from COVID-19. This was no easy task. Most institutions of higher education are more like small- or medium-sized cities than mere schools. In addition to educating the future of America, they provide housing for hundreds or thousands of students; serve and sell food; operate stores; employ large numbers of teachers, administrators, and other employees; sponsor sports teams; host public events; and perform many other services.

1

2.      On March 6, 2020, the University of Washington became the first major university to cancel in-person classes and exams.[1] By the middle of March, others across the country had followed suit and more than 1,100 colleges and universities in all 50 state have canceled in-person classes and shifted to online-only instruction.

3.      Plaintiff is no different. Due directly to the COVID-19 pandemic, in March 2020 Plaintiff: closed dorms and sent students home; shuttered all dining halls; closed administrative buildings; canceled spring sports seasons; canceled graduation ceremonies; closed campus entirely to all but a few essential personnel; and took many other precautions. Revenue-producing summer events also were canceled. Residence halls remained closed. Summer classes were held online. And events that would normally take place on campus during the summer – like summer camps – were canceled in their entirety.

4.      Plaintiff, like many institutions, has reopened its campuses in a limited capacity for the fall semester, which is in progress. But the effects of the COVID-19 pandemic continue to deprive Plaintiff of the full use of its campuses and property. Large gatherings are still prohibited. Visitors are limited. And Plaintiff has taken unprecedented additional action to ensure that campus is safe for students, faculty, and staff who have returned in some part to campus.

5.      Apart from the nightmarish logistical challenge, and the serious disruption to their core mission of education, the measures colleges and universities have taken as a result of COVID-19 have had a devastating financial impact. After closing of dorms and dining halls, colleges and universities, including Plaintiff, provided room-and-board reimbursements, often totaling in the millions of dollars, and suffered and continue to suffer significant losses in the form of, among other things, lost revenue and added expense associated with COVID-19.

---

[1] https://www.ncsl.org/research/education/higher-education-responses-to-coronavirus-covid-19.aspx

6.      Common categories of lost revenue suffered by Plaintiff and other similarly situated institutions of higher education include, among other things: (a) lost tuition income; (b) lost fundraising income; (c) lost income from residential population room, board and related fees; (d) lost income from extra or co-curricular activities (*e.g.*, athletic and other contests, student concerts); (e) lost income from college retail outlets (*e.g.*, bookstore, cafeteria, childcare services, parking); and (f) lost income from special events and rental (*e.g.*, conferences, camps, retreats, weddings, reunions, non-student concerts and similar events).

7.      Common categories of added expense incurred by Plaintiff and other similarly situated institutions of higher education include, among other things: (a) added technology expense associated with rapid shift to virtual learning; (b) added technology expense associated with rapid shift to work-from-home; (c) added public safety expenses in the form of cleaning and sanitizing, implementing physical distancing measures and COVID-19 testing; and (d) added public safety expenses in the form of facilities changes (*e.g.*, installation of signage, plexiglass shields, etc.).

8.      Fortunately – or so it thought – Plaintiff purchased an all-risk commercial property insurance policy from Defendant to protect it in the event of an event such as COVID-19. The Policy provides $100,000,000 in coverage for a wide variety of losses, including loss of use of property, business interruption, and property damage. Plaintiff's Policy is a standard form that Defendant identifies as:  The Zurich EDGE Global Policy.

9.      Plaintiff made a claim for coverage under the Policy for insured direct physical loss of or damage caused by a Covered Cause of Loss (defined as "All risks of direct physical loss of or damage from any cause unless excluded.") to Covered Property, asking for Defendant's confirmation as to coverage with respect to each and every potentially applicable basis for coverage under all provisions of the Policy.

10.     Defendant denied Plaintiff's claim for coverage under the Policy.

11.     According to Defendant, COVID-19 cannot under any set of facts or circumstances cause physical loss of or damage to property within the meaning of the Policy. Defendant also contends the Policy includes a "Contamination" exclusion that applies and defeats any COVID-19 related coverage claim. Defendant's position on coverage under the Policy is wrong as to Plaintiff and all other similarly situated insureds.

12.     Defendant's denial of Plaintiff's claim for coverage is not unique. Based on other lawsuits and other publicly available information, it appears that Defendant is taking a consistent position with other insureds – including other higher education institutions – across the country.

13.     Defendant's conduct is particularly galling in light of the huge amount of premiums insurers like Defendant receive annually. According to information published by the Insurance Information Institute, the U.S. insurance industry collected net premiums of $1.22 trillion in 2018. Premiums recorded by property/casualty insurers accounted for 51% of that amount. Between 2014 and 2018, these insurers wrote net premiums each year of between $497 billion to $612.6 billion but only incurred losses of between $277.7 billion and $360.9 billion.

14.     This is a class action for declaratory judgment and breach of contract arising from Defendant's refusal to pay claims related to COVID-19 as required by the property insurance policies it sold to Plaintiff and other institutions of higher education.

## **PARTIES**

15.     Plaintiff Lindenwood Female College d/b/a Lindenwood University is an entity chartered by the General Assembly of the State of Missouri with its principal place of business in Saint Charles, Missouri.

4

16.     Plaintiff is a private liberal arts college. It was founded in 1827 and is the second-oldest institution of higher education west of the Mississippi River. Plaintiff's main campus is located in Saint Charles, Missouri. It also has a Belleville, Illinois campus location and smaller locations throughout Missouri. Plaintiff now serves over 7,500 students.

17.     As a result of, and in connection with the COVID-19 pandemic and related governmental restrictions, and due to the presence of COVID-19 on and near Plaintiff's insured property and surrounding areas, Plaintiff ceased normal operations and effectively closed its campus in mid-March 2020 and has not yet been able to resume normal operations and use of its insured property in the same manner as it had prior to the COVID-19 pandemic .

18.     Friday, March 6, 2020 was Plaintiff's last day of normal campus operations in advance of Spring Break. On March 11, 2020, Plaintiff announced that it would switch entirely to virtual classes from March 13 to 29 for all class sessions at all locations. Residential students, who were on Spring Break through March 15, were strongly encouraged not to return to campus if possible. Campus events during this period were cancelled or postponed. Dining facilities were limited to take-out meals only, and hours available to access campus facilities were limited.  As the University's President John Porter explained at the time, "Lindenwood's number one priority is the health and well-being of our students, the campus community, and the community as a whole. We feel this move is the responsible course of action to limit the spread of this virus." Plaintiff stated it would re-assess the situation regarding changes or extensions beyond March 30.

19.     On March 16, 2020, Plaintiff announced its decision that all spring term courses must be completed in a virtual format and that in-person courses would not resume this spring. Plaintiff also announced that students were required to vacate on-campus housing by Sunday, March 22, 2020. Plaintiff conducted a review of all faculty and staff positions and restricted the

campus to essential personnel. Consistent with surrounding areas, on March 23, 2020, St. Charles County amended its earlier Emergency Orders and issued a stay-at-home order effective March 24, 2020, at 12:01 a.m., which along with other applicable governmental Orders that are of public record, served to further limit and restrict the University's operations and use of campus buildings and facilities for an extended period of time. Similar Orders impacted the University's campus in Belleview, Illinois and other smaller locations throughout Missouri.

20.    On March 25, 2020, Plaintiff announced its first confirmed COVID-19 test of a student who had last been on campus March 16. On April 7, 2020, the University announced that no classes would be offered in a seated format through August 9, 2020.

21.    COVID-19 was and has been physically present on Plaintiff's campuses and surrounding areas since at least March 2020. During Plaintiff's normal campus operations, there are many thousands of students, faculty, employees and other visitors to the University's insured property. Given the nature of the virus and its community spread (as more fully discussed below), persons infected with COVID-19 have been present on Plaintiff's campuses and surrounding areas. As noted, Plaintiff announced its first confirmed case of COVID-19 on March 25, of a student who had last been on campus March 16. In addition (as more fully discussed below), studies have shown that COVID-19 spreads through droplets and aerosols. Aerosols in particular are capable of traveling long distances through the air. Due to community spread of the virus, COVID-19 has reached and been physically present on Plaintiff's campuses after traveling through the air, independent of any individual. Thus, the virus has been present throughout the University's insured property and surrounding areas – a dangerous condition by any measure. Finally, because COVID-19 spreads widely through the community, it has been present in the air and on surfaces on property surrounding Plaintiff's property.

22.     The presence of COVID-19 on property and in the air at property effectively eliminates the utility and habitability of such property sufficient to constitute direct physical loss of or damage to property within the meaning of the Policy. In addition, the imminent risk of the presence of COVID-19 on property and in the air at the property effectively eliminates the utility and habitability of such property sufficient to constitute direct physical loss of or damage to property within the meaning of the Policy.

23.     As a result, Plaintiff's insured property was rendered unsuitable for its intended use and was subject to a variety of limitations, restrictions, and prohibitions, including by orders of applicable government entities ("Stay at Home Orders"), which are matters of public record.

24.     The condition of Plaintiff's insured property has not returned to its condition pre-occurrence. COVID-19 has caused Plaintiff to suffer substantial losses (in part described above). For example, Plaintiff issued refunds (in excess of $5,000,000) to students related to room and board alone. Plaintiff has lost revenue from the cancelation of substantially all on-campus summer activities. And, although campus is opened in a limited capacity for the current fall semester, Plaintiff has incurred substantial costs to ensure campus is safe for students, faculty, and staff. Among other things, Plaintiff has installed 258 hand sanitizer stations throughout campus; purchased 830 gallons of hand sanitizer for campus use; installed GPS ionizations technology in certain buildings on campus to assure indoor air quality; distributed Spic and Span Disinfecting 3-in-1 cleaner to departments across campus for additional cleaning of high touch spaces; begun disinfecting all campus spaces regularly with CDC-approved cleaning products; and implemented daily professional classroom cleanings. COVID-19 also caused Plaintiff to modify its on-campus residency requirement. This resulted in many students who otherwise would have been required to live in University housing to move off campus – causing Plaintiff to lose additional revenue.

25.     Plaintiff is a member of the Midwestern Higher Education Compact ("MHEC"). MHEC is comprised of institutions of higher education across the country who formed a group to develop best practices, collaborative efforts, and cost-sharing opportunities. Upon information and belief, all MHEC members have purchased and are covered by the same Zurich EDGE Global Policy as Plaintiff.

26.     Defendant Zurich American Insurance Company, is an Illinois corporation, with its principal place of business in Schaumburg, Illinois

## JURISDICTION AND VENUE

27.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this judicial district and division. The Policy at issue covers Plaintiff's campus and other property located in the State of Missouri.

## FACTUAL BACKGROUND

29.     The novel coronavirus – named "severe acute respiratory syndrome coronavirus 2" or "SARS-CoV2" – has spread widely and rapidly across the United States. The illness related to SARS-CoV-2 is "novel coronavirus disease 2019," commonly abbreviated to "COVID-19." Although the virus and related illness are distinct, for purposes of this Complaint, Plaintiff refers to both interchangeably as "COVID-19."

30.     Over 2,500 Missourians and over 216,000 Americans have died of COVID-19 and there have been over 150,000 confirmed COVID-19 cases in Missouri and over 7.9 million confirmed cases in the United States as of the date of this filing, according to the Coronavirus Resource Center at Johns Hopkins University.

31.     Plaintiff's insured property has been rendered unsuitable for its intended use and has been subject to a variety of limitations, restrictions, and prohibitions, including by government Stay at Home Orders imposed by the State of Missouri; the State of Illinois; Saint Charles County, Missouri; St. Clair County, Illinois; Saint Charles, Missouri; and Belleville, Illinois.

32.     Plaintiff also imposed limitations, restrictions, and prohibitions due to the dangerous condition caused by the presence of COVID-19 and its on-going and continuous threat to Plaintiff's insured property.

### COVID-19

33.     A growing body of evidence suggests that the virus transmits both through droplets, when someone sneezes and coughs, and aerosols, which are produced by normal breathing.

34.     Aerosols are particularly concerning because unlike droplets, which stay airborne for only a few seconds, aerosols are water droplets suspended in air and can remain suspended for hours, until gravity ultimately forces them to the nearest surface below.

35.     Consequently, aerosols can spread widely through air flow and settle on surfaces hundreds of feet away from any infected individual. Thus, someone not even in the vicinity of an infected person can unknowingly touch an infected surface, later touch their face, and become infected.

36.     As a result, at least 42 states and countless local governments issued substantially similar "stay at home" orders, the purpose of which was to mitigate and slow the spread of COVID-19.

37.     According to the CDC, everyone is at risk of getting COVID-19. The virus can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.[2]

38.     According to studies, the virus can live on surfaces for several days if not longer.[3] The New England Journal of Medicine reported finding that experimentally-produced aerosols containing the virus remained infectious in tissue-culture assays, with only a slight reduction in infectivity during a 3-hour period of observations. "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…."[4]

39.     The study also found that COVID-19 was detectable for up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[5]

40.     All of these materials, and others similarly susceptible to COVID-19 contamination, are used by Plaintiff throughout its facilities and operations.

41.     The study's results indicate that individuals can become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

---

[2]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[3]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[4]     https://www.nejm.org/doi/full/10.1056/NEJMc2009324
[5]     https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces

42.     A consensus appears to be emerging that COVID-19 can travel through the air via aerosols. For example, aerosol scientist Lidia Morawska of the Queensland University of Technology in Brisbane, Australia told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[6]

43.     An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of COVID-19 on surfaces and in the air about *13 feet* from patients in two hospital wards in Wuhan, China, leading the authors to conclude that the virus spreads in aerosols in addition to large respiratory droplets. The investigators found evidence of the virus in swabs of floors, computer mice, trash bins, bed handrails, patients' face masks, health workers' personal protective equipment, and air vents.[7]

44.     The authors also surmised that the high rate of positivity for floor samples in the hospital strongly suggest that droplets fall to the ground and then are spread via footwear contacting the droplets on the ground. For example, every sample tested from the pharmacy floor tested positive for COVID-19 even though no patients were housed there.[8]

45.     Another study conducted in Wuhan indicates that staff movement, floor cleaning, and the removal of personal protective equipment could transmit the virus through the re-suspension of virus-contaminated aerosols.[9]

---

[6]     https://www.nature.com/articles/d41586-020-00974-w

[7]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[8]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[9]     https://www.biorxiv.org/content/10.1101/2020.03.08.982637v1

46.     Kimberly Prather, an aerosol chemist at the University of California, San Diego told *Science* magazine: "I'm relieved to see aerosolization is accepted. This added airborne pathway helps explain why it is spreading so fast."[10]

47.     Aerosol particles are held in the air by physical and chemical forces. The suspended particles remain for *hours or more*, depending on factors such as heat and humidity. If virus particles can be suspended in air for more than a few seconds, like, for instance, the measles virus can, then anyone passing through could become infected by a pathogenic aerosol cloud. And the virus can travel long distances and land on surfaces, only to be stirred back up into the air later by cleaning or other disturbances.

48.     In a study published on October 7, 2020, researchers at Australia's national science agency found that SARS-CoV-2 can survive for up to 28 days on common surfaces like cash, glass, vinyl, and stainless steel.[11] The study also determined that the virus survives longer at colder temperatures, a particular concern as winter approaches in the United States.

49.     Dr. Debbie Eagles, on the Australia study's lead researchers, said: "Our results show that SARS-CoV-2 can remain infectious on surfaces for long periods of time, reinforcing the need for good practices such as regular handwashing and cleaning surfaces."[12]

50.     The SARS virus that caused a 2003 epidemic is a coronavirus and is similar to COVID-19. As a result, the behavior of SARS during the 2003 epidemic provided evidence about any aerosol risk from COVID-19.

51.     A 2014 analysis published in the journal *Clinical Infectious Diseases* investigated a seemingly puzzling outbreak in a Hong Kong apartment complex whose residents had not been

---

[10]     https://www.sciencemag.org/news/2020/04/you-may-be-able-spread-coronavirus-just-breathing-new-report-finds#

[11]     https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7

[12]     https://www.sciencedaily.com/releases/2020/10/201011220759.htm

in close contact with each other.[13] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[14]

52.     The implications of airborne spread of COVID-19 are extremely serious. Airborne spread means that the virus can travel long distances from any infected person. It can then infect someone who unknowingly walks through a pathogenic cloud. It can also infect someone by settling on a physical surface, which someone touches and later becomes infected. And regardless of the transmission method, the evidence suggests that COVID-19 can be transmitted by shoes even once it reaches the ground.

53.     State and local governments implemented the Stay at Home Orders due to the presence of COVID-19 on property and in the air in the area within their respective jurisdictions.

54.     Stay at Home Orders governing Plaintiff's campus and property required Plaintiff to undertake additional cleaning and decontamination measures and to follow disease mitigation advice from the CDC and other public health agencies.[15] The CDC and other public health agencies recommended and continue to recommend enhanced cleaning and other disease mitigation measures (like social distancing) to combat the pandemic spread of COVID-19.[16] Complying with these Orders has caused Plaintiff to incur increased costs to clean and decontaminate its property. Physical distancing measures have also been costly for Plaintiff to implement and have yielded reduced capacities of Plaintiff's insured property.

---

[13]     https://academic.oup.com/cid/article/58/5/683/365793
[14]     *Id.*
[15]     *E.g.*, https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html; https://www2.illinois.gov/ Pages/Executive-Orders/ExecutiveOrder2020-10.aspx
[16]     *E.g.*, https://www.cdc.gov/coronavirus/2019-ncov/community/reopen-guidance.html

### *The Zurich Policy*

55.     To protect itself against risks like COVID-19, Plaintiff purchased the Policy from Defendant. The Policy was in effect at the time of the COVID-19 outbreak. Plaintiff paid all premiums required by the Policy.

56.     Plaintiff is the Named Insured under the Policy.

57.     Defendant is the effective and liable insurer of the Policy and policies meeting the class definition.

58.     Generally, under property insurance policies like those issued by Defendant to Plaintiff and class members, the insuring agreements provide coverage for all risks of physical loss of or damage to property, unless specifically excluded.

59.     The Policy is an "all-risk" policy. It covers "direct physical loss of or damage caused by a Covered Caused of Loss to Covered Property." Ex. A at 16. "Covered Cause of Loss" is defined as "all risks of direct physical loss of or damage from any cause unless excluded." *Id.* at 64. The Policy provides coverage up to a limit of $100,000,000. *Id.* at 17.

60.     One section of the Policy excludes "Contamination, and any cost due to Contamination, including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy…." Ex. A at 25.

61.     The Policy defines "Contamination" as "any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, **virus**, disease causing or illness cause agent, Fungus, mold or mildew." Ex. A at 66 (emphasis added).

62.     However, the Policy contains an "Amendatory Endorsement" which explicitly *removes* the word "virus" from the definition of "Contamination" and also the definition of

14

"Contaminant." *See* Ex. A at 120-22. Specifically, the definition of "Contamination" on pg. 66 of the Policy containing the word "virus" "is deleted" and "replaced by" the following: "Contamination (Contaminated) – Any condition of property due to the actual presence of any Contaminant(s)." *Id.* at 122.

63.     The "Amendatory Endorsement" then provides that the definition of "Contaminant" on pg. 66 of the Policy "is deleted" and "replaced with" the following: "Contaminant(s) – Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids alkalis, chemicals, waste (including material to be recycled, reconditioned or reclaimed), other hazardous substances, Fungus or Spores." Ex. A at 122.  The word "virus" is specifically omitted.

64.     The "Amendatory Endorsement" removing "virus" from the Contamination exclusion in the Policy states that it applies to the entire Policy. Ex. A at 120 ("THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.").

65.     The "Amendatory Endorsement" removing "virus" from the Contamination exclusion in the Policy is titled "Amendatory Endorsement - Louisiana." *Id.* at 120. However, the Policy makes clear that the *body* of the endorsement, not its title, modifies the scope of the Contamination exclusion. The Policy expressly states that all "titles of the various…endorsements are solely for reference and shall not in any way affect the provisions to which they relate." *Id.* at 62. As a result, the title of the Endorsement does not affect the body of the Endorsement, which must be applied according to its plain terms.

66.     No other portion of the Policy purports to exclude viruses from coverage under the Policy. Nor does Plaintiff's Policy contain an exclusion for "pandemics," "communicable disease," or anything similar.

67.     The decision by Defendant to explicitly remove the word "virus" from the Contamination exclusion evinces a clear intent by Defendant to provide coverage for viruses, like COVID-19, under the Policy, and an admission by Defendant that viruses, like COVID-19, are a non-excluded cause of direct physical loss of or damage to covered property under the Policy.

68.     This is particularly true because the risk of a virus like COVID-19 was foreseeable to, if not foreseen by, insurance companies like the Defendant. The Insurance Services Office ("ISO"), an organization that provides policy writing services to insurers, has recognized for years that a virus can constitute physical damage to property. Specifically, in 2006, it announced the submission of an exclusion of loss "due to disease-causing agents such as viruses and bacteria."

69.     In connection with circulating the virus exclusion, it sent the following statement to state insurance regulators:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

70.     Despite the availability of a specific exclusion for viruses, Plaintiff's Policy contains no such exclusion, and, in fact, Defendant chose to expressly remove an exclusion that might apply to viruses from the Policy.

71.     Because damage due to viruses constitute physical damage and loss under the Policy, and the Stay at Home Orders have caused Plaintiff to have lost the use of its premises for their intended purpose, Plaintiff's losses are covered under the Policy. Moreover, Plaintiff suspended operations and effectively closed campus due to COVID-19, and has not yet been able

16

to resume normal operations or use of its property in the same manner as it had prior to the COVID-19 pandemic.

72.     The Policy provides coverage for several different types of losses arising from COVID-19 that are relevant here, including, but not limited to, the following.

73.     The Policy provides coverage for **"Time Element"** loss sustained due to the necessary suspension of operations caused by direct physical loss of or damage to the insured property. Exhibit A at 29. "Gross earnings loss" is the "actual loss sustained" under Time Element coverage. *Id.* Gross earnings includes "income derived from the Insured's business activities." *Id.* at 30. Plaintiff has suffered Time Element losses due to COVID-19.

74.     The Time Element section also covers **"Extra Expense."** Ex. A at 31. Extra Expenses are expenses incurred "to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended" due to direct physical loss of or damage to property. *Id.* Plaintiff has incurred Extra Expenses due to COVID-19.

75.     The Policy also provides coverage for an interruption to business caused by an order from a **"Civil or Military Authority."** Exhibit A at 36. Specifically, the Policy covers "the actual Time Element loss sustained by the Insured…resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of civil or military authority that prohibits access to the Location." *Id.* The governmental order must result from a response to "direct physical loss of or damage caused by" a cause of loss covered by the Policy. *Id.*  Access to Plaintiff's property has been limited, restricted, and prohibited in part or in total due to the presence and threat of COVID-19 and related Stay-at-Home Orders.

76.     The Policy also provides **"Ingress and Egress"** coverage, which requires Defendant to pay for "the actual Time Element loss sustained by the Insured…resulting from the

17

necessary suspension of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers, or employees is prevented by physical obstruction due to direct physical loss of or damage caused by" a cause of loss covered by the Policy. *Id.* Ingress to and egress from Plaintiff's property have been prevented due to COVID-19.

77.     The Policy also provides coverage for **"Decontamination Costs,"** which covers "the increased cost of decontamination and/or removal of…Contaminated Covered Property" if "Covered Property is Contaminated from direct physical loss of or damage caused by" a cause of loss covered by the Policy. Ex. A at 38. Plaintiff has incurred Decontamination Costs due to COVID-19.

78.     The Policy also provides additional coverages that apply to Plaintiff's claim, including, but not limited to **"Extended Period of Liability"** Time Element coverage; **"Expediting Costs"**; and **"Protection and Preservation of Property"**. *See* Ex. A.

## CLASS ACTION ALLEGATIONS

79.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiff brings this action on behalf of itself and all others similarly situated, and seeks to represent the following nationwide classes:

      a.  **Nationwide Declaratory Judgment Class.**  All institutions of higher education that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

      b.  **Nationwide Breach Class.**  All institutions of higher education that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

c. **Midwestern Higher Education Compact ("MHEC") Subclass.** All institutions of higher education who are members of the Midwestern Higher Education Compact that are covered by one of Defendant's policies in effect during the COVID-19 pandemic.

d. **Missouri Subclass.** All institutions of higher education in Missouri that are covered by one of Defendant's policies in effect during the COVID-19 pandemic.

80.     Plaintiff's Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as set forth more fully herein.

81.     **Numerosity.** COVID-19 has impacted thousands of higher education institutions across the country and Defendant is a nationwide insurer with, on information and belief, hundreds or more policies issued with the relevant provisions. Consequently, the Classes each number in at least the hundreds and most likely thousands, and thus the numerosity standard is satisfied. Moreover, because the members of the Classes are geographically dispersed across the country, members of the MHEC Subclass are geographically dispersed across many states, if not elsewhere, and members of the Missouri Subclass are geographically dispersed across Missouri, joinder of all Class members in a single action is impracticable. Class members and Subclass members may be informed of the pendency of this class action through direct mail or other means based on Defendant's records of its policyholders.

82.     **Commonality.** There are questions of fact and law common to the Classes that predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendant's actions include, without limitation, the following:

a.   Does the Policy cover losses resulting from the COVID-19 pandemic?

b.  Does the Policy cover losses resulting from state and local Stay At Home Orders requiring the suspension or reduction in business?

c.  Does the presence of COVID-19 on property and in the air at property eliminate the property's utility and habitability sufficient to constitute direct physical loss of or damage to property within the meaning of the Policy?

d.  Does the Policy include a "Contamination" exclusion that applies and defeats any COVID-19 related coverage claim?

e.  Has Defendant wrongfully denied claims for business losses resulting from COVID-19 and/or the Stay at Home Orders?

f.  Do any of the following provisions in the Policy cover losses due to COVID-19: (i) physical loss of or damage to property; (ii) time element; (iii) civil or military authority; (iv) ingress/egress; (v) extra expense; (vi) decontamination costs; (vii) expediting costs; and/or (viii) protection and preservation of property?

g.  Has Defendant breached its Policy by refusing to cover COVID-19 related losses?

h.  Are Class members entitled to reasonable attorneys' fees and expenses?

83.  **Predominance.** The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein. Specifically, thousands of institutions of higher education are impacted by Defendant's denial of coverage for COVID-19 losses and their claims arise from a common factual predicate, which is the nationwide shutdown and suspension of activities due to COVID-19.

84.  **Typicality.** Plaintiff's claims are typical of those of the Classes as Plaintiff was subject to the same or similar policy provisions and the losses for all members relate to COVID-19 and the related closure orders and the claims arise from the same legal theories.

85.  **Superiority.** A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendant has acted or refused to act on grounds generally

20

applicable to the Class and Subclasses. The presentation of separate actions by individual Class members and Subclass members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests.

86.    **Adequacy**. Plaintiff is an adequate representative of the Class and Subclasses because it is a member of the Class / Subclasses and its interests do not conflict with the interests of those it seeks to represent. The interests of the Class / Subclass members will be fairly and adequately protected by Plaintiff and its counsel, who have extensive experience prosecuting complex class litigation.

87.    **Declaratory Relief and certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure**. On information and belief, Defendant has refused, or intends to refuse, coverage due to COVID-19 business interruption and other covered losses for all, or most, policyholders with covered Policies and final injunctive and/or declaratory relief mandating that Defendant cover the losses of Class members is appropriate respecting the class as a whole.

88.    **Issue Class and Modification of Class Definitions and Creation of Subclasses**. In the alternative, Plaintiff reserves the right to seek certification of one or more common issues pursuant to Rule 23(c)(4). In addition, Plaintiff reserves the right to modify the definitions of the class and/or create subclasses either by amendment to the complaint or by motion for class certification, including but not limited to subclasses for policyholders under specific Policy provisions.

<u>**COUNT I: DECLARATORY JUDGMENT**</u>
**(Individually and on behalf of Nationwide Declaratory Judgment Class, MHEC Subclass and Missouri Subclass)**

89.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

90.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

91.     An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policy. In September 2020, Plaintiff requested coverage for COVID-19 related losses. Defendant has stated that the Policy does not provide coverage for COVID-19 related losses. Defendant is in breach of its obligations by refusing to provide coverage under the Policy. Moreover, upon information and belief, Defendant has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

92.     Plaintiff contends that Defendant has breached the Policy in the following respects:

a.      Plaintiff and the class have suffered losses due to COVID-19 covered by the Policy.

b.      Defendant is obligated to pay Plaintiff and the class for those losses.

c.      Defendant has failed to pay Plaintiff and the class for those losses.

93.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

### COUNT II: BREACH OF CONTRACT AND/OR ANTICIPATORY BREACH
**(Individually and on behalf of Nationwide Breach Class, MHEC Subclass and Missouri Subclass)**

94.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

95.     Plaintiff and the class purchased property coverage policies from Defendant.

96.     The Policies are valid and enforceable contracts between the Defendant and Plaintiff and class members.

22

97.     Plaintiff and the class substantially performed their obligations under the terms of the Policy including giving Defendant notice of the claim. Alternatively, Defendant has waived any terms or conditions of coverage and may not assert any term or condition in the Policy as a defense to liability.

98.     Plaintiff and the class have sustained a loss covered by the Policy arising from COVID-19 and associated state and local Stay at Home Orders.

99.     Defendant stated that the Policy does not provide coverage for COVID-19 related losses. Defendant is in breach of its obligations by refusing to provide coverage under the Policy. Moreover, upon information and belief, Defendant has refused or will refuse other, similar claims claiming that COVID-19 losses are not covered by the Policy. Defendant therefore unjustifiably refuses to pay for losses covered by the Policy, in breach of the Policy.

100.     Defendant has refused to pay claims related to COVID-19 on a uniform and class-wide basis, in breach of the Policies.

101.     Any conditions precedent to a claim for breach of contract under the Policies have occurred, been satisfied, or, in any event, should be excused or otherwise discarded or deemed waived by Defendant on the basis of futility or other applicable law.

102.     As a direct and proximate result of Defendant's breaches, Plaintiff and the class have sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

a.     That the Court enter an order certifying the class, appointing Plaintiff as representatives of the class, appointing Plaintiff's counsel as class counsel, and

directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

b.    For a judgment against Defendant for the causes of action alleged against it;

c.    For compensatory damages in an amount to be proven at trial;

d.    For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy;

e.    For pre-judgment and post-judgment interest at the maximum rate permitted by law;

f.    For Plaintiff's attorney's fees;

g.    For Plaintiff's costs incurred; and

h.    For such other relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Date: October 16, 2020                Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

*s/ Patrick J. Stueve*
Patrick J. Stueve, MO #13847
Todd M. McGuire, MO #51361
Bradley T. Wilders, MO # 78301
Curtis Shank, MO #66221
Abby E. McClellan, MO #66069
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:    816-714-7100
Facsimile:    816-714-7101
Email:    stueve@stuevesiegel.com
Email:    mcguire@stuevesiegel.com
Email:    wilders@stuevesiegel.com
Email:    shank@stuevesiegel.com
Email:    mcclellan@stuevesiegel.com

**MILLER SCHIRGER LLC**

John J. Schirger, MO #60583
Matthew W. Lytle, MO #59145
Joseph M. Feierabend, MO #62563
4520 Main Street, Suite 1570
Kansas City, MO 64111
Telephone:      (816) 561-6500
Facsimile:      (816) 561-6501
Email:          jschirger@millerschirger.com
Email:          mlytle@millerschirger.com
Email:          jfeierabend@millerschirger.com

**LANGDON & EMISON LLC**

J. Kent Emison, MO #29721
911 Main Street
PO Box 220
Lexington, Missouri 64067
Telephone:      (660) 259-6175
Facsimile:      (660) 259-4571
Email:          kent@lelaw.com

**SHAFFER LOMBARDO SHURIN, P.C.**

Richard F. Lombardo, MO #29748
2001 Wyandotte Street
Kansas City, MO 64108
Telephone:      816-931-0500
Facsimile:      816-931-5775
Email:          rlombardo@sls-law.com

*Attorneys for Plaintiff and the Proposed Classes*